IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAE INTERNATIONAL<br><br>　　　　Plaintiff,<br><br>v.<br><br>INTERNATIONAL AEROSPACE<br>QUALITY GROUP A.I.S.B.L.,<br><br>　　　　Defendant. | Civil Action No.  25-268 |

## COMPLAINT

Plaintiff SAE International ("SAE"), by and through their undersigned counsel, hereby brings this action against Defendant International Aerospace Quality Group A.I.S.B.L. ("IAQG") for injunctive and declaratory relief.

## PRELIMINARY STATEMENT

1. For over 100 years, SAE has worked to build partnerships and trust within the automotive and aerospace industries. SAE brings leading engineers, professionals, and businesses together to create consensus-based safety and quality standards. These significant efforts have led to unprecedented industry self-regulation and standardization in the planes, trains, and automobiles used throughout the world.

2. As part of this self-regulation, a handful of organizations known as Auditor Authentication Bodies exist to regulate and certify auditors. Those authenticated individuals then go on to audit and inspect quality management systems, maintenance organizations, and distributors throughout the world in the aerospace (including civilian aviation, space, and defense) industries.

3. Among the Auditor Authentication Bodies, SAE's Probitas Authentication program is considered a benchmark program for training and authenticating auditors.

4. As another consensus-building effort, SAE helped to create and steward IAQG, a non-governmental consortium of aerospace equipment manufacturers and suppliers, to develop global quality standards. The IAQG has since become a separate legal entity, but has continued to receive financial, technical, and administrative support from SAE in a decades-long partnership.

5. Through this partnership, SAE and IAQG executed an agreement in which SAE would transfer the copyright ownership of certain standards to IAQG. In return, SAE was to be given an exclusive license to commercialize those standards, and a right of first refusal to collaborate with IAQG on any business opportunities and derivative works, through 2032.

6. In violation of this trust and years of partnership with SAE, IAQG began creating its own IAQG Authentication Program without any opportunity for involvement or collaboration by SAE. Every effort by SAE to participate in this new program has been effectively shut down.

7. SAE has now learned that IAQG has instead partnered with a third-party servicer to implement the IAQG Authentication Program, apparently in an effort by IAQG to monopolize the industry and push out SAE and the eight (8) other Auditor Authentication Bodies from the market.

8. The actions of IAQG have broad implications. If permitted to continue with its plan, IAQG will effectively monopolize the market and place an unknown third-party, with no prior experience, in a position to certify aerospace auditors throughout the world. IAQG has undertaken these efforts without seeking the consensus or collaboration that has been characteristic of the marketplace, which threatens irreparable harm, increased costs, and confusion in the aerospace and civil aviation industry.

9. At a minimum, SAE is entitled to a right of first refusal for the IAQG Authentication Program, which is necessarily derived from standards that SAE is entitled to commercialize through 2032, to prevent the complete loss of its unique market position.

## THIS ACTION

10. SAE files this Complaint to prevent IAQG from launching a new program called IAQG Authentication, which provides a process through which to certify auditors in the aerospace industry, because such action would breach IAQG's contractual obligations to SAE. Furthermore, if IAQG Authentication is launched, such actions by IAQG would eliminate the other eight (8) organizations' auditor authentication activity globally, creating significant disruption and chaos to the aerospace industry.

11. SAE and IAQG's agreement requires IAQG, before it launches IAQG Authentication, to offer IAQG Authentication to SAE pursuant to the agreement's right of first refusal granted by IAQG to SAE for any business opportunity or derivative works. The IAQG Authentication program is derivative of SAE's standards governing auditor authentication bodies.

12. SAE will suffer irreparable harm if IAQG Authentication is released without SAE being able to exercise its right of first refusal, including the reasonable due diligence associated with assessing whether it wishes to exercise the right or not and assessing the larger impact IAQG Authentication will have on the certification of auditors, who conduct quality inspections relating to aerospace safety and reliability.

## PARTIES

13. SAE is a Pennsylvania not-for-profit corporation, organized and operated pursuant to 26 U.S.C. § 501(c)(3), with its principal place of business located at 400 Commonwealth Drive, Warrendale, PA 15096.

14. IAQG is a Belgian not-for-profit corporation, and upon information and belief, with its principal place of business located at Rue Abbé Cuypers 3, 1040 Brussels, Belgium.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between the parties and the amount of controversy exceeds seventy-five thousand dollars.

16. This Court has personal jurisdiction over IAQG because it has the required minimum contacts with this forum to establish specific jurisdiction. IAQG has purposefully availed itself of SAE's services, specifically SAE's standards development tools and Probitas Authentication program, which are located in the Western District of Pennsylvania, and this District serves as the center of the activity relevant to the parties' Agreement, which IAQG will breach if it releases IAQG Authentication.

17. Based on IAQG's contacts as described in Paragraph 16, it was wholly foreseeable that they would be hauled into court in the United States District Court for the Western District of Pennsylvania.

18. Venue is appropriate in this Court because this Court has personal jurisdiction over all parties and a substantial portion of the events giving rise to the claim asserted in this action occurred in this judicial district.

## BACKGROUND AND FACTUAL AVERMENTS

A. **History of SAE and IAQG's Relationship**

19. SAE is a professional association and global leader in developing and publishing consensus-based standards for the automotive and aerospace industries.

20. Since its founding in 1905, SAE has developed consensus-based standards and engineering best practices covering the design, manufacturing and performance of, *inter alia*,

automotive and aircraft components for engineering professionals to ensure consistent quality and safety across these industries.

21. The automotive and aerospace industries collectively benefit from reliable and consistent quality and reliability standards and the international collaborative framework underlying their creation and revision.

22. As such, disruptions or inconsistent standards can jeopardize uniformity and increase the possibility of safety events.

23. In the late 1990s, aerospace industry leaders and stakeholders engaged with SAE to collectively form what would eventually become IAQG.

24. IAQG operated as a consortium of aerospace original equipment manufacturers and suppliers to also develop quality standards specifically for the aerospace industry.

25. Starting in the late 1990s, SAE and its affiliate, SAE Industry Technologies Consortia ("SAE-ITC"), stewarded the then-unincorporated IAQG consortium by providing overall consortium management, financial, logistical, and legal services, IT support, standards development tools, policies, procedures and governance framework, and auditor training and authentication programs through SAE's Probitas Authentication Program (the "Probitas Program").

26. In 2013, SAE spun out IAQG and establish it as a separate legal entity. IAQG remained partners with SAE, and SAE continued to provide IAQG with financial and legal services, standards development tools, IT support, and utilization of the Probitas Program.

27. As part of its IT support to IAQG (and other entities), SAE maintained OASIS, a database of, *inter alia*, qualified auditors used within the industry and aerospace supplier and certification data, for IAQG through versions 1.0 and 2.0.

28. In 2020, IAQG made the extremely expensive decision to take on the development and management of OASIS 3.0 by itself. This resulted in substantial delays, from 2020 to 2024, in the launch of the database, as well as significant cost overruns.

29. This is part of a series of actions by IAQG that have increased inefficiencies, redundancies, and unnecessary costs in the development of standards that have now impacted the entire aerospace industry.

30. IAQG thereafter began discussions with SAE to increase its royalties from SAE's sales of the AS9100 standards and to obtain copyright ownership of these standards in exchange for granting SAE an exclusive publication arrangement until 2032.

31. The AS9100 standards are produced by IAQG, using SAE's standards development tools, and their copyrights are owned by SAE.

**B.     The Agreement**

32. These discussions resulted in SAE and IAQG signing an International Standards Development, License, and Publication Agreement ("Agreement") on May 12, 2022, memorializing this royalty, copyright, and publication arrangement. (Agreement, attached hereto as **Exhibit A**, which is being filed under seal).

33. As of the date of filing of this Complaint, SAE retains ownership over the copyrights of these standards.

34. The Agreement provides, in Article 4 – Moral and Derivative Works Rights, that:

4.1. In furtherance of the license set forth above, the parties agree that not all instances of derivative works or initiatives may be known or defined at the time of this Agreement and that there may be occasions where new initiatives or derivatives represent departures from the current models, including training materials, content, and programming.

4.2 Each party *agrees to notify opportunities to the other for consideration and right of first refusal,* such right not to be unreasonably withheld if an agreement to

collaborate cannot be reached.

4.3 Further, *each party agrees to inform the other party of any potentially conflicting training activities, ASD-related quality certification standards, similar activities, or opportunities are made known and work in good faith to address the same for the mutual benefit of the parties*.

(emphasis added).

35. "Approved Derivative Works" is defined in the Agreement as "publications, writing, information in written or electronic format that may include the release of other products or sales that are based upon one or more pre-existing released publication, writing or information to which a party already holds copyright." (Agreement, art. 1).

36. The Agreement also explicitly provides for equitable relief, stating that,

> The parties acknowledge[] that a breach by the other party of this Agreement may cause irreparable damages, for which an award of damages would not be adequate compensation, and agrees that, in the event of such breach or threatened breach, the non-breaching party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available in any court, in addition to any other remedy to which such party may be entitled at law or in equity.

(Agreement, § 18.9).

    **C.    IAQG Authenticator Program Must be Offered to SAE Before it is Released Under the Terms of the Agreement.**

37. SAE established the Probitas Program at IAQG's request. SAE spent substantial money to create the Probitas Program, beginning with the acquisition of Exemplar Global, an aerospace authentication business, in 2016. Over the following decade, SAE continued to invest in developing the Probitas Program.

38. Currently, the Probitas Program provides a full certification process for aerospace industry auditors who are responsible for inspections in the aerospace industry, meaning that it receives and reviews aerospace auditor applications, facilitates re-authentications, and makes final certification decisions.

39. By IAQG's own admission, the Probitas Program has delivered excellent results for IAQG.

40. There are nine auditor authentication bodies ("AAB") for the aerospace industry, including SAE's Probitas Program, operating worldwide.

41. The AS9104/1, AS9104/2, and AS9104/3 standards, published by SAE, include the requirements for aerospace auditors and AABs.

42. These standards provide IAQG member companies (which encompasses the full universe of aerospace equipment manufacturers and suppliers) with the rules and guidelines to administer Aerospace Quality Management System ("AQMS") activities – which aid aerospace companies in meeting customer, safety and regulatory requirements.

43. The AQMS program is administered by IAQG for its member companies through the adoption of the Industry Controlled Other Party ("ICOP") Scheme, an IAQG and aerospace industry managed scheme for the audit and certification of an organization's AQMS by accredited certification bodies.

44. The AS9104/1 standard defines the industry-accepted requirements for the ICOP Scheme to provide confidence that aerospace organizations meet applicable AQMS standard requirements.

45. The AS9104/2 standard documents the ICOP oversight process to provide objective evidence of conformance to established AS9100-series standards.

46. The AS9104/3 standard provides the minimum requirements for AQMS auditors who participate in AQMS certification and registration activities for the aerospace industry.

47. The content of these SAE standards is essential to form IAQG AAB programs, because it dictates the processes and procedures an AAB must use to manage the certification and proper assessment of auditors in the aerospace industry.

48. All AABs must be approved by IAQG to conduct auditor authentication activity in the aerospace industry.

49. SAE owns the copyrights for these standards.

50. IAQG has developed and intends to launch its IAQG Authentication program, which is derived from SAE's copyrighted standards.

51. Upon information and belief, IAQG has partnered with a third-party servicer to operate this program.

52. IAQG never provided notice to SAE of the development of the IAQG Authentication program, as it was contractually obligated to do, such that SAE could exercise its right of first refusal.

53. In late summer 2024, IAQG released an internal job posting for the IAQG Authentication program.

54. Richard DeMary ("Mr. DeMary"), the Director of Probitas Authentication at SAE, made an inquiry into this job posting and was subsequently blocked by IAQG from accessing the posting.

55. On September 10, 2024, IAQG President Eric Jefferies ("Mr. Jeffries") announced that IAQG was moving forward with consolidating the activities of the nine AABs, including SAE, into one program.

56. At that time, SAE had no indication that IAQG would be utilizing a third-party servicer to operate the program, as opposed to complying with its contractual obligations to SAE.

57. Indeed, on or around September 11, 2024, Mr. Jefferies informed Mr. DeMary that no decision had yet been made regarding a provider for its consolidated program.

58. Thereafter, Mr. DeMary offered to attend the IAQG General Assembly meetings the next month to help lay out the plans for transitioning to the new IAQG Authentication.

59. On October 24, 2024, IAQG announced "IAQG Authentication" at its 56th General Assembly session in Tokyo, Japan.

60. There, an IAQG representative stated that this program would be accomplished by streamlining and bringing in-house the auditor authentication activities that the nine AABs provided to IAQG, but did not mention the use of a third-party servicer.

61. In November 2024, Mr. DeMary began a dialogue with Mr. Jeffries regarding how SAE and IAQG could work together towards IAQG's anticipated authentication program.

62. However, on or about January 23, 2025, Mr. Jefferies informed Mr. DeMary that the IAQG Authentication program would be launched in partnership with a third-party servicer – neither SAE's Probitas Program nor another existing AAB – which has no history or experience in the field of assessment and qualification of individuals for auditor certification.

63. IAQG has thereafter made no attempt to communicate with SAE regarding the intended launch of this product or the third-party servicer it will be working with, despite knowing that this will constitute a breach of the party's Agreement.

64. IAQG has not acted in good faith in the development of this program, the planned violation of its Agreement with SAE, and the failure to communicate with industry actors about these imminent disruptions to the existing collaborative framework of the aerospace industry.

65. Upon information and belief, IAQG intends to launch this program imminently in March 2025.

66. Given this imminent launch, SAE sent a Notice Letter to IAQG detailing its concerns and its intention to file this Complaint to protect its rights under the Agreement. (Notice Letter, attached hereto as **Exhibit B**).

67. SAE will be irreparably harmed by the launch of IAQG's derivative auditor authentication program because SAE will lose (1) its investment in the development and maintenance of the Probitas Program, (2) the very purpose underlying the Agreement and the bargained-for exchange of exclusivity for copyright ownership of the AS9100 standards, and (3) the right of first refusal over an irreplicable business opportunity.

68. Additionally, the aerospace industry itself, which benefits from a collaborative framework and the resultant economies of scale, will be harmed.

## COUNT I – BREACH OF CONTRACT

69. SAE incorporates the preceding paragraphs as though set forth in full.

70. The Agreement between SAE and IAQG is legally binding.

71. SAE is entitled to notification and the right of first refusal for any derivative works pursuant to the Agreement's binding terms. (Agreement, ¶¶ 4.1-4.3).

72. SAE has performed its obligations to IAQG pursuant to the Agreement.

73. IAQG has begun working with a third-party servicer to develop an auditor authentication program derivative of SAE's Probitas Program without notifying SAE and providing SAE with a right of first refusal.

74. IAQG has also unequivocally expressed its intention to launch an auditor authentication program derivative of SAE's Probitas Program without granting SAE the right of first refusal.

75. Accordingly, IAQG's conduct amounts to a breach and anticipatory breach of the Agreement.

76. SAE will be irreparably harmed by IAQG's use of its Probitas Program, which it developed for IAQG at significant cost, to launch a derivative auditor authentication program.

77. SAE seeks immediate relief in the form of a preliminary injunction and then permanent injunction against the announcement and launch of the IAQG Authentication program.

78. Granting a preliminary injunction will not only protect SAE, but will also serve the broader interests of the aerospace industry in preventing the elimination of competition between AABs and maintaining the present collaborative framework depended upon for reliable and consistent quality standards.

## COUNT II – DECLARATORY JUDGMENT

79. SAE incorporates the preceding paragraphs as though set forth in full.

80. There is an actual and justiciable controversy as to whether IAQG is permitted to launch an auditor authentication program derivative of SAE's Probitas Program without granting SAE the right of first refusal.

81. Based on the foregoing, SAE requests a declaration that (a) SAE is entitled to a right of first refusal to IAQG's auditor authentication program; and (b) IAQG's launch of its IAQG Authentication program without providing SAE with notification and a first right of refusal would constitute a breach of parties' Agreement.

WHEREFORE, SAE International respectfully requests (1) the issuance of a preliminary and permanent injunction preventing IAQG from launching its IAQG Authentication program or any such derivative auditor authentication programs without providing SAE with notification and a first right of refusal, as provided in the agreement; (2) a declaration that (a) SAE is entitled to a right of first refusal to IAQG's auditor authentication program and (b) IAQG's launch of its IAQG Authentication program without providing SAE with notification and a first right of refusal would

constitute a breach of parties' Agreement; and (3) any such other and further relief, general or special, at law or in equity, to which SAE may be justly entitled.

Dated: February 24, 2025					Respectfully submitted,

								*/s/ Shawna J. Henry*
								**BLANK ROME LLP**
								Kevin M. Eddy (Pa. I.D. No. 92904)
								Shawna J. Henry (Pa. I.D. No. 316881)
								Maya C. Bradley (Pa. I.D. No. 334251)
								Union Trust Building
								501 Grant Street, Suite 850
								Pittsburgh, PA 15219
								Phone: (412) 932-2800
								Shawna.Henry@blankrome.com
								Kevin.Eddy@blankrome.com
								Maya.Bradley@BlankRome.com

								*Attorneys for Plaintiff SAE International*

13

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAE INTERNATIONAL<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL AEROSPACE QUALITY GROUP A.I.S.B.L.,<br><br>Defendant. | Civil Action No. |

## VERIFICATION

I, **RICHARD DEMARY**, pursuant to 28 U.S.C. § 1746, hereby declare and verify under penalty of perjury that I am the Director of Probitas Authentication under the SAE Industry Technologies Consortia, an affiliate organization of SAE International. I further declare that I have read the foregoing Complaint and verify that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

Dated: Feb 24, 2025

Verified this day by:

*Richard DeMary*

**RICHARD DEMARY**
Director of Probitas Authentication
SAE Industry Technologies Consortia
*An Affiliate of SAE International*