## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SAE INTERNATIONAL,                        )
                                          )
            Plaintiff,                    )
                                          )       Civil Action No. 25-268
      v.                                  )
                                          )
INTERNATIONAL AEROSPACE                   )
QUALITY GROUP A.I.S.B.L.,                 )
                                          )
            Defendant.

### MEMORANDUM OPINION

Presently before the Court is Defendant International Aerospace Quality Group A.I.S.B.L.'s ("IAQG") Motion to Dismiss for lack of jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2). (Docket No. 43). Plaintiff SAE International ("SAE") opposes the motion. (Docket No. 52). For the reasons set forth herein, the Court will <u>GRANT</u> IAQG's motion.

## I.    BACKGROUND

SAE is a nonprofit organized under 26 U.S.C. § 501(c)(3), which was established in 1905 and has its principal place of business in Warrendale, Pennsylvania. (Docket No. 1 at ¶¶ 13, 19, 20). IAQG is a nonprofit with its principal place of business in Brussels, Belgium. (*Id.* ¶ 14). SAE and IAQG are part of the automotive and aerospace industries, which rely significantly on self-regulation. (*Id.* ¶¶ 1-2). In the industry (or industries), fewer than a dozen organizations known as "Auditor Authentication Bodies" ("AABs") work to "regulate and certify auditors," who go on to "audit and inspect quality management systems, maintenance organizations, and distributors throughout the world in the aerospace (including civilian aviation, space, and defense) industries." (*Id.* ¶ 2). Among various AABs, SAE has the "Probitas Authentication Program"— operated by SAE Industry Technologies Consortia (*id.* ¶ 40)—which SAE describes in the

Complaint as a "benchmark program for training and authenticating auditors." (*Id.* ¶ 3). Probitas and other AABs are subject to the requirements set forth in certain Standards (AS9104/1, AS9104/2, and AS9104/3), the copyrights of which are owned by SAE. (*Id.* ¶¶ 31, 41).

SAE helped to create IAQG. (*Id.* ¶ 4). IAQG is described in the Complaint as a "non-governmental consortium of aerospace equipment manufacturers and suppliers." (*Id.*). In the AAB-approval scheme described above, IAQG's role is that "[a]ll AABs must be approved by IAQG to conduct auditor authentication activity in the aerospace industry." (*Id.* ¶ 48). Since 2013, the IAQG has been a separate legal entity from SAE, albeit one that receives "financial, technical, and administrative support from SAE in a decades-long partnership." (*Id.* ¶¶ 4, 26). More recently, IAQG endeavored to create its own Authentication Program, with which SAE fears that IAQG will "monopolize the industry and push out SAE and the eight (8) other [AABs] from the market." (*Id.* ¶ 7). That alleged goal is the focus of this lawsuit wherein SAE argues that IAQG's plan is not only disappointing in light of their long history, but—more importantly—it is also a breach of contract.

In the Complaint, SAE alleges that it and IAQG "executed an agreement in which SAE would transfer the copyright ownership of certain [SAE-copyrighted] standards to IAQG" and, "[i]n return, SAE was to be given an exclusive license to commercialize those standards, and a right of first refusal to collaborate with IAQG on any business opportunities and derivative works, through 2032." (*Id.* ¶ 5).[1] Pursuant to their agreement—the **International Standards**

---

[1] In the Complaint, SAE explains that this agreement came about when IAQG decided "to take on the development and management of OASIS 3.0 by itself," OASIS 3.0 being an updated version of OASIS 1.0 and 2.0, databases that SAE had maintained of "qualified auditors," "aerospace supplier and certification data," etc. (*Id.* ¶¶ 27-28). Discussions related to the OASIS 3.0 endeavor eventually gave rise to discussions about SAE transferring copyright ownership of standards to IAQG in exchange for an exclusive publication arrangement until 2032. (*Id.* ¶ 30).

**Development, License, and Publication Agreement (hereinafter "the Agreement")**, which was executed on May 12, 2022 (attached to the Complaint as **Exhibit A**) (*id.* ¶ 32)—IAQG sought to increase royalties from SAE's sales of the "AS9100 standards and to obtain copyright ownership of [such] standards in exchange for granting SAE an exclusive publication arrangement until 2032." (*Id.* ¶¶ 30, 32).[2]

IAQG is alleged to have violated the Agreement when it "partnered with a third-party servicer to implement the IAQG Authentication Program." (*Id.* ¶ 7). SAE argues that it is entitled to a right of first refusal for the IAQG Authentication Program which, it alleges, "is necessarily derived from standards that SAE is entitled to commercialize through 2032." (*Id.* ¶ 9). SAE premises its argument that IAQG has denied SAE its entitlement to a right of first refusal on provisions in the Agreement that state in Sections 4.2 and 4.3:

> Each party agrees to notify opportunities to the other for consideration and right of first refusal, such right not to be unreasonably withheld if an agreement to collaborate cannot be reached.
>
> Further, each party agrees to inform the other party of any potentially conflicting training activities, ASD related quality certification standards, similar activities, or opportunities are made known and work in good faith to address the same for the mutual benefit of the parties.

(*Id.* ¶ 34 (citing Art. 4.2 and 4.3 (emphasis omitted)). Invoking those provisions of the Agreement, SAE alleges that IAQG's Authentication Program is derived from SAE's copyrighted standards and IAQG was contractually obligated to give it notice that it was developing the program so SAE could exercise its right of first refusal. (*Id.* ¶¶ 50, 52).

---

[2]     SAE explains that the "AS9100 standards are produced by IAQG, using SAE's standards development tools, and their copyrights are owned by SAE." (*Id.* at ¶ 31). Currently, SAE continues to retain ownership of the copyrights for the standards. (*Id.* ¶ 33).

Based on these and the other factual allegations in the Complaint, and to prevent its loss, SAE filed this suit for Breach of Contract (**Count I**) and Declaratory Judgement (**Count II**).  SAE also filed a motion for preliminary injunction (Docket No. 2) to stop IAQG from launching IAQG Authentication.  SAE alleges that it "will suffer irreparable harm if IAQG Authentication is released without SAE being able to exercise its right of first refusal, including the reasonable due diligence associated with assessing whether it wishes to exercise the right or not and assessing the larger impact IAQG Authentication will have on the certification of auditors, who conduct quality inspections relating to aerospace safety and reliability."  (Docket No. 1 at ¶ 12).

IAQG opposes the motion for preliminary injunction (Docket No. 24) and has moved for dismissal of this case for lack of subject matter jurisdiction and personal jurisdiction.  (Docket No. 43).  Additionally, IAQG argues that the Agreement mandates arbitration in Belgium, and a stay of this case in the meantime.  SAE opposes IAQG's motion to dismiss in its entirety.  (Docket No. 52).  The parties' positions on the motion are fully briefed.  (Docket Nos. 43, 44, 52, 53).

## II.   <u>DISCUSSION</u>

The Court will first address the question of whether it may exercise personal jurisdiction over IAQG.  In the Complaint, SAE alleges that IAQG is subject to the Court's personal jurisdiction "because [IAQG] has the required minimum contacts with this forum to establish specific jurisdiction" where it has "purposefully availed itself of SAE's services, specifically SAE's standards development tools and Probitas Authentication program, which are located in the Western District of Pennsylvania" and where "this District serves as the center of the activity relevant to the parties' Agreement, which IAQG will breach if it releases IAQG Authentication." (Docket No. 1 at ¶ 16).  IAQG refutes SAE's assertion that it is subject to the Court's personal jurisdiction and argues that there is no personal jurisdiction here where IAQG's primary contact

with this forum is merely its having entered the Agreement with SAE and SAE's presence in the forum.

When a party challenges a court's personal jurisdiction under Rule 12(b)(2), the plaintiff must come forward with facts and "affidavits or other competent evidence" to demonstrate jurisdiction. *Consol Pennsylvania Coal Co., LLC v. Mahalaxmi Cont'l Ltd.*, No. CV 22-781, 2023 WL 1862771, at *3 (W.D. Pa. Feb. 9, 2023), *aff'd*, No. 23-1383, 2024 WL 510518 (3d Cir. Feb. 9, 2024) (quoting *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)); *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (explaining that the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction" although the plaintiff also gets the benefit of having all its allegations taken as true and all disputed facts construed in its favor). If the Court holds no evidentiary hearing on personal jurisdiction, then "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Katz v. Am. Council of Learned Societies*, No. CV 21-4306, 2021 WL 4551399, at *3 (D.N.J. Oct. 5, 2021) (quoting *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004)).

The Court may exercise personal jurisdiction over a non-resident defendant to the extent permitted by the state where the Court sits. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). Pennsylvania law permits the exercise of "specific personal jurisdiction over a nonresident defendant … 'to the fullest extent allowed under the Constitution of the United States'" such that personal jurisdiction "may be based on the most minimum contact with this Commonwealth allowed under the Constitution." *Consol Pennsylvania Coal Co., LLC*, 2023 WL 1862771, at *3 (quoting 42 PA. CONS. STAT. § 5322(b)). "Personal jurisdiction is based upon general jurisdiction or specific jurisdiction." *Id.* (quoting *Danziger & De Llano, LLP v. Morgan Verkamp*

*LLC*, 948 F.3d 124, 129 (3d Cir. 2020)).  SAE argues for the Court's exercise of **specific** personal jurisdiction over IAQG.  (*See* Docket Nos. 1 at ¶ 16; 44 at 10 ("SAE does not claim that the IAQG is subject to general jurisdiction in Pennsylvania."); 52 at 7 ("For all of these reasons, IAQG has the sufficient minimum contacts with Pennsylvania, and the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice.")).  "Specific jurisdiction exists when the 'plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum.'" *Hasson v. FullStory, Inc.*, 114 F.4th 181, 186–87 (3d Cir. 2024) (quoting *Pinker*, 292 F.3d at 368).

Accordingly, SAE must show that IAQG had "certain minimum contacts with ... [the Commonwealth of Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Consol Pennsylvania Coal Co., LLC*, 2023 WL 1862771, at *3 (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)); *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  The Third Circuit states the specific jurisdiction analysis in three parts that focus on "the relationship among the defendant, the forum, and the litigation."  *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  The three parts are that: (1) the defendant "purposefully directed its activities at the forum"; (2) the case "arise[s] out of or relate[s] to at least one of those activities"; and, assuming that the first two requirements are met, then (3) "whether the exercise of jurisdiction otherwise comports with fair play and substantial justice."  *Id.* (cleaned up); *O'Connor,* 496 F.3d at 317 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  The first two parts correspond to the "minimum contacts" requirement, and the last part, as is evident, pertains to traditional notions of fair play and substantial justice.  *Stewart v. Boeing Co.*, No. CV 21-938, 2022 WL 4082113, at *2 (W.D. Pa. Sept. 6, 2022).

Applying that standard here, the Court asks whether SAE has shown that IAQG—a Belgian nonprofit headquartered in Brussels—purposefully directed activities giving rise to or related to the claims in this suit at Pennsylvania. SAE points to the following instances which—in SAE's view—constitute IAQG's purposeful direction of activities at the forum:

- SAE spun IAQG out into a separate legal entity in 2013, and IAQG continued/continues to receive financial and IT support from SAE including utilization of its standards development tools. (Docket No. 52 at 5).
- Additionally, "tools and resources used to crate the AS9104-series standards, which … are the subject of this action and the Agreement, are controlled by [Pennsylvania-headquartered] SAE." (*Id.* at 6).
- SAE negotiated the Agreement with IAQG from its Pennsylvania headquarters. (*Id.* at 6)
- The AS9104-series standards at issue were created by a committee sitting at SAE and "SAE owned, and has always owned, the copyrights to the AS9104-series standards and publishes those standards." (*Id.*)

Based on the above, SAE argues that IAQG targeted its activities at Pennsylvania when it engaged in "efforts to participate in the governance and promulgation of [such] standards." (*Id.*). SAE points to two declarations in the record for support of its argument. In the first, Richard DeMary ("DeMary"), Director of SAE's Probitas Authentication, indicates that Eric Jeffries, the President of IAQG, was a representative on the writing team for the AS9104/3 standard. (Docket No. 34, Ex. 1 at ¶¶ 8-9). When DeMary learned of IAQG's intent to create IAQG Authentication and to consolidate AAB activity, he submitted a proposal by which SAE and IAQG could collaborate, but he received no "substantive response." (*Id.* at ¶¶ 16, 18-19). DeMary submitted a second proposal (*id.* at ¶ 21) but received no response (*id.* at ¶ 22), and DeMary thereafter learned that IAQG had chosen a third party as a partner. (*Id.* at ¶ 23). In the second declaration, Emilie Delo ("Delo") indicated that, as Assistant General Counsel of SAE, she could confirm that the AS9104-series standards were created through the IAQG-1 committee organized under SAE, though she did not indicate where or when that occurred. (Docket No. 34, Ex. 2 at ¶ 7). However, she generally indicated that the "tools used to create and publish the AS9104-series standards are

located in Western Pennsylvania." (*Id.* at ¶ 8). She further indicated that the Agreement was negotiated in Western Pennsylvania. (*Id.* at ¶ 10).

SAE acknowledges that its arguments and evidence do not show IAQG's physical presence in Pennsylvania, but SAE argues that "physical presence in the forum is no longer determinative" of personal jurisdiction "in light of modern commercial business arrangements," and that "mail and wire communications can constitute purposeful contacts when sent into the forum." (Docket No. 52 at 5 (quoting *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 176 (3d Cir. 2006)). Thus, SAE asserts that the facts alleged and competent evidence so far presented in this case provide an adequate basis for this Court to exercise personal jurisdiction over IAQG.

The Court appreciates the argument, but ultimately finds that it would be inappropriate to hale IAQG into this Court. To show that a defendant personally directed its activities at a particular forum, it is not enough just to point to the "defendant's contacts with persons who reside in the forum." *Katz*, 2021 WL 4551399, at *4; *Walden*, 571 U.S. at 285 ("But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."). In the context of contract formation, merely contracting with a resident of a forum state "is not, by itself, sufficient to justify personal jurisdiction over the nonresident," *id.* (quoting *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)), and "informational communications in furtherance of a contract between a resident and nonresident do not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the nonresident defendant." *Id.* (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 152 (3d Cir. 1996)). To determine whether personal jurisdiction is appropriate with respect to a breach of contract claim, the Court "must consider the totality of the circumstances, including

the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." *Remick*, 238 F.3d at 256.

As an initial matter, the Court will largely set aside SAE's proffer of its longstanding relationship with IAQG as a basis for the exercise of specific personal jurisdiction in this matter. SAE blends elements of general and specific personal jurisdiction in its argument for the exercise of personal jurisdiction in this case. For instance, in support of its opposition to IAQG's motion, SAE relies in part on the fact that it and IAQG have had a business relationship since the 1990s. *See e.g.*, Docket No. 52 at 6 ("[T]he Agreement is performed substantially in Pennsylvania and *represents just one agreement of many during the course of Pennsylvania-based SAE and IAQG's decades'-long business history*." (emphasis added)). That appeal to the longstanding relationship between SAE and IAQG speaks more to general jurisdiction than it does to whether IAQG purposefully directed its activities into this forum in such a way as gave rise to or related to the breach of contract alleged in the present lawsuit. For there to be *specific* personal jurisdiction in this case, there must be some act(s) on IAQG's part by which IAQG took hold "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

For specific jurisdiction, SAE most relevantly argues that IAQG "continues to receive significant financial and IT support from SAE, including utilization of its standards development tools," SAE negotiated the agreement with IAQG from its Western Pennsylvania headquarters, the series of standards relevant to the parties' Agreement were created by a committee sitting at SAE, and SAE owns and controls standards which are the subject of the Agreement. (Docket No. 52 at 5-6). However, the Court also considers that SAE has not alleged or provided evidence regarding the nature of it and SAE's communications during contract negotiations for the Agreement, and

that the Agreement itself is governed by Belgian law.[3]  In that regard, this case bears resemblance to *Katz v. Am. Council of Learned Societies*, where the United States District Court for the District of New Jersey determined there was no personal jurisdiction over a defendant who communicated terms of an employment-type offer to a New Jersey plaintiff, Dr. Katz.  In that case, Dr. Katz was a Princeton professor, and the defendant (American Counsel of Learned Societies ("ACLS")) was a nonprofit in the District of Columbia, representing the United States at the Union Academique Internationale ("UAI").  2021 WL 4551399, at *1.  ACLS sent Dr. Katz a letter asking him to serve as an ACLS delegate to the UAI.  *Id.* at *2.  Dr. Katz and ACLS thereafter exchanged further correspondence to determine, among other things, when Dr. Katz's term as a delegate would begin, Dr. Katz's acceptance of the offer, and ACLS's confirmation of receipt of his acceptance.  *Id.* After ACLS rescinded the offer, Dr. Katz sued ACLS in New Jersey for breach of contract, and ACLS moved to dismiss for lack of personal jurisdiction.  *Id.*

Deciding ACLS's motion, the district court noted competing considerations: on the one hand, "the fact that a non-resident has contracted with a resident of the forum state [was] not, by itself, sufficient to justify personal jurisdiction over the nonresident," *id.* at *4 (quoting *Farino*, 960 F.2d at 1223); on the other hand, sufficient minimum contacts *could* be "supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences,

---

[3]     The Agreement's choice-of-law provision is found in Article 17 of the Agreement.  Another provision of Article 17 indicates that "[a]ny dispute arising out or in connection with this Agreement shall be finally settled by a panel of three arbitrators appointed and acting in accordance with the rules of arbitration of the CEPANI."  (Docket No. 44 at 5 (citing Art. 17.2)).  While the Court will not reach IAQG's arbitration argument, that provision would seem to encompass the present dispute.  In another provision of the Agreement—18.9—the parties agreed that they should be able to seek equitable relief as a remedy for breaches or threatened breaches of the Agreement, including not only injunctive relief, but also "any other relief that may be available from any court."  (*Id.* at 21–22 (citing Art. 18.9)).  SAE argues in opposition to IAQG's motion to dismiss that, under 18.9, "the parties are entitled to seek equitable relief in any court," meaning equitable actions are carved out of their arbitration agreement.  (Docket No. 52 at 12).  The Court finds it difficult to follow that interpretation of 18.9.

or the course of dealings between the parties." *Id.* at \*4.  The district court explained that the most important consideration was whether the communications and other contacts reflected "deliberate targeting of the forum." *Id.* Ultimately, the district court determined that the ACLS had not deliberately targeted the forum by its communications to Dr. Katz because the communications were "more analogous to the calls and letters that contracting parties exchange to determine the terms of an agreement," *i.e.*, were not the type of contacts that would satisfy the court's inquiry into personal jurisdiction. *Id.* at \*4, 6 (quoting *Colvin v. Van Wormer Resorts, Inc.,* 417 F. App'x 183, 187 (3d Cir. 2011)).

As in *Katz*, the totality of the circumstances here, and SAE's evidence and arguments, fail to show that IAQG deliberately targeted the forum.  IAQG has no Pennsylvania presence or employees.  The Agreement between the parties does not contemplate the application of Pennsylvania law, nor does it contemplate the direction of activities into Pennsylvania, which weighs against the Court's exercise of personal jurisdiction.[4]  The Agreement at issue, and its alleged breach, are about the use of SAE's copyrighted standards and eventual transfer of copyright ownership of certain standards to IAQG.  It is far from evident to the Court that such a claim arises from or relates to IAQG's contacts with Pennsylvania.  For that reason, the Court finds that it cannot exercise personal jurisdiction over IAQG, and the Court must dismiss the case.  *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 549–50 (E.D. Pa. 2018) ("Pursuant to Federal

---

[4]    *See G&C Fab-Con, LLC v. M&S Civ. Consultants, Inc.*, No. 320CV08425BRMDEA, 2021 WL 268177, at \*5 (D.N.J. Jan. 27, 2021) ("[T]he record indicates Defendant did not solicit the subcontract, never visited New Jersey, performed all of the work under the subcontract in Colorado, ***which was governed by Colorado law*** …. [a]ccordingly, exercising personal jurisdiction over Defendant is improper." (emphasis added)); *see also Agnello v. Paragon Dev., Ltd.*, No. CIV. 07-19E, 2008 WL 45260, at \*5 (W.D. Pa. Jan. 2, 2008) (finding no personal jurisdiction where, among other things, the employment contract at issue indicated that the parties would submit to the jurisdiction of Nevada, rather than Pennsylvania).

Rule of Civil Procedure 12(b)(2), a court must grant a defendant's motion to dismiss if the court lacks personal jurisdiction over the defendant.").[5]

## III.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will <u>grant</u> IAQG's motion to dismiss for lack of personal jurisdiction (Docket No. 43) and order this matter dismissed.  The Court will enter an Order consistent with this Memorandum Opinion.  The Court additionally intends to enter an order denying SAE's motion for preliminary injunction as moot considering the Court's determination that it lacks personal jurisdiction over IAQG.

*/s/ W. Scott Hardy*
W. Scott Hardy
U.S. District Judge

Date:  August 26, 2025

cc/ecf:  All counsel of record

---

[5]    The Court will grant the motion to dismiss for lack of personal jurisdiction without jurisdictional discovery.  "[J]urisdictional discovery is appropriate when 'the plaintiff presents factual allegations that suggest "with reasonable particularity" the possible existence of the requisite "contacts between the party and the forum state."'"  *Aldossari on Behalf of Aldossari v. Ripp*, 49 F.4th 236, 259 (3d Cir. 2022) (citation omitted).  SAE has not given the Court reason to believe that jurisdictional discovery would produce yet undiscovered evidence of the necessary minimum contacts in this case.  Thus, to permit jurisdictional discovery at this juncture would be to sanction a "fishing expedition," which the Court has no intention of doing.  *Id.*  Not only that, but SAE has already had opportunity for limited discovery in connection with its motion for preliminary injunction, the parameters of which included "the formation of the parties' agreement and the meaning and usage of its key terms."  (Docket No. 40 at 4).  SAE has not indicated how additional discovery would help it make the showing necessary for personal jurisdiction.  (Docket No. 52 at 7 n. 2 ("Should the Court determine that there is insufficient evidence to support the exercise of personal jurisdiction on the current record, the Court should allow for jurisdictional discovery.")).